IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>DAVID ESSER,<br>    Defendant. | Criminal Case Nos.<br>21-cr-003 JJM-LDA<br>21-cr-028 JJM-LDA |

### GOVERNMENT'S SENTENCING MEMORANDUM

*"Not everyone has the drive to make money like us."* – David Esser, to Michael Lambert.

The United States recommends a sentence of 121 months' imprisonment for the drug trafficking crimes Defendant David Esser committed in two separate cases, and for committing the second offense while out on release for the first. Such a sentence is "sufficient, but not greater than necessary" in the defendant's case to further important statutory purposes of sentencing: to promote respect for the law and to reflect the seriousness of the offenses, see 18 U.S.C. § 3553(a)(2)(A), to afford adequate deterrence to criminal conduct, see 18 U.S.C. § 3553(a)(2)(B), and to avoid unwarranted sentence disparities among the defendant and his co-conspirators, see 18 U.S.C. § 3553(a)(6). Such a sentence also satisfies the provisions of 18 U.S.C. § 3147, which mandates that a defendant who commits a new crime while on release shall receive a prison sentence consecutive to any other imposed imprisonment. In addition, the United States seeks a money judgment against David Esser in the amount of $6,510,000 – representing the gross proceeds he reaped over the 70-month drug trafficking period.

### Nature of Esser's Massive, Steroid-Trafficking Conspiracy

Defendant Esser is a steroid distributor[1] who, for years, hired a network of middlemen and women to work tirelessly for his personal financial gain. As the mastermind of his own drug

---

[1] Anabolic steroids may not, at first blush, appear to present a serious danger to the public, but there are significant risks associated with using these substances without proper oversight from a medical professional. "Continued steroid misuse can act on some of the same brain pathways and

1

trafficking business, the defendant facilitated shipments of raw steroid powder and other controlled substances from China to hand-selected "pharmacists" in several states. The pharmacists cooked the substances into illegitimate liquid- and pill-based steroids and packaged them into hundreds of thousands of pill capsules and vials Esser procured for them. Esser then directed his chemists to mail the drugs to an array of addresses he hand selected in New England, for distribution packaging. He then employed runners to retrieve the pharmacists' products and deliver them to his stash houses, where multiple people would apply labels (designed by Esser) and package the pills and vials for distribution to thousands of customers throughout the United States. In order to ensure his business thrived, Esser involved himself in *all aspects* of the drug distribution process and paid a slew of specialized people to assist – even hiring a "rep" to market and advertise the illegitimate steroids on exclusive online message boards – one of which he owned and managed himself.[2] He paid his chemists between $5,000-10,000 *per week* for their cooking, and incentivized stash house employees who labeled, packaged, and mailed the products by paying them per quantity of pills/vials moved. One such employee estimated he/she alone sent 15

---

chemicals that are affected by other drugs including dopamine, serotonin, and opioid systems." Anabolic Steroids DrugFacts, National Institutes of Health (NIH): National Institute on Drug Abuse, https://www.drugabuse.gov/publications/drugfacts/anabolic-steroids (last visited November 8, 2021). Short-term side effects resulting from misuse of anabolic steroids include paranoid jealousy, extreme irritability and aggression, delusions, impaired judgement, and mania. Id. Furthermore, "anabolic steroid misuse might lead to serious long-term, even permanent, health problems," including kidney failure, liver damage, high blood pressure and an enlarged heart, as well as an increased risk of stroke, heart attacks, artery damage, and cancer. Id.

     Defendant Esser orchestrated his manufacturing and distribution scheme without any consideration for the adverse personal or societal effects of steroid use, and did so for his own financial gain. This puts him in the same category as any other drug dealer—regardless of the type of substance he distributed.

[2] The United States refers the Court to the PSR, ECF No. 34 at pp. 5–14, as well as the Exhibits in support of this Sentencing Memo, for a full factual account of the drug trafficking conspiracy's breadth and Defendant Esser's orchestration of all participants' actions.

2

packages per day, 6 days per week for Esser. The quantity of steroids Esser's conspiracy pumped throughout the United States is, quite literally, off the Sentencing Guidelines chart.[3]

Defendant is a self-proclaimed businessman who, until now, has thwarted the legal consequences of his criminal activity. Despite law enforcement twice raiding his "offices" – the code name used for his stash houses – and uncovering tens of kilograms of illegitimate steroids on each occasion,[4] the defendant believed he was untouchable. A co-conspirator told officials that after the first raid in June 2018 where Esser was never criminally charged, Esser rebuilt his operations in a way that he believed would avoid law enforcement's attention. Exhibit E at 2–3. His business apparently only temporarily slowed down after that raid: the defendant bragged to the co-conspirator that he was able to restock his stash house by spending $35,000, and his business was back up and running shortly after the raid. Id. Esser became more resourceful after that raid, deciding to cut ties with his previous "pharmacist" and ultimately hiring a new "chemist," Michael Lambert, to set up a clandestine laboratory in Esser's own Pennsylvania (PA) real estate property. Id. In that laboratory, Lambert cooked anabolic steroids in pill and liquid form for Esser's ultimate distribution. See Exhibits C & C1. In February 2020, federal authorities arrested Esser in connection with Case No. 1:20-MJ-18 and raided several of his properties, but they missed the one in which Lambert and his wife were operating Esser's laboratory.

---

[3] As detailed in the PSR, the defendant's offense conduct significantly exceeded 60,000 units – the cap on the offense level assigned to offenses related to Schedule III controlled substances – several times over. See ECF No. 34 at 4 & 15.

[4] In the 2018 consent search of Esser's North Attleboro stash house – which Esser called his "business address" – law enforcement seized over 30 kilograms of steroids, including over 78,000 units in both pill and liquid form, and 10g amphetamine (a Schedule II substance). In the February 2020 search of Esser's stash house (located just across the street from the previous stash house and which Esser called his "office"), law enforcement seized over 80 kilograms of steroids as well as other controlled substances and prescription pharmaceuticals.

<u>Esser's Criminal Actions while on Pretrial Release</u>

After Esser's pre-trial release in Case No. 1:20-MJ-18, his flagrant disregard for the law continued. The same day that he was released on bail, Esser called Lambert and urged Lambert to continue cooking in Esser's PA laboratory. Ex. C1 at 4. Lambert ultimately moved to Virginia, however, and began cooking under a different brand name than that of Esser. At some point in 2020, Esser re-established contact with Lambert through an online steroid forum that Esser ran, called *Hardcore Underground*. Esser partnered with Lambert to sell steroids under Lambert's *Integrity Labs* label.

Text messages between Esser and Lambert, attached hereto as Exhibit A, give the Court a clear view into the conspirators' criminal mindset while Esser was out on pretrial release by this Court. When, for example, Lambert informed Esser about a third co-conspirator's concern about getting caught due to Esser's previous arrest, Esser said the co-conspirator "*over reacted cause there's no way anyone would know anything about him . . . . Some guys get scared, you gotta think logically.*" Ex. A at 50–52. The text messages not only reflect Esser's steroid orders to multiple chemists in July 2020 but also his strategizing with Lambert about how to develop an incognito, bulletproof business for the future: "*I like it. It's perfect. $money guy isn't connected to production. Production isn't connected to me.*" Id. at 36. While out on bail, Esser was actively trying to "*drum up business*" by picking "*a good rep*" on three different steroid messaging board websites: "*I tell him everyday I need him to post more, make our forums there look active . . . . I'm paying for advertising, mass pm and mass emails.*" Id. at 43. An example of a mass email that Esser proudly created himself is contained in the text message chain. See id. at 48–49.

Despite the Court's explicit instructions for Esser to refrain from violating federal, state, or local law on release, see 20-mj-18 ECF No. 7, the defendant continued employing a broad

4

network of people to assist him in violating the law, all the while making a far more substantial profit than they did. Business was good – even after Esser's arrest. Not a month after his first arrest, Esser was back fulfilling steroid orders for more than $1,000 worth of Bitcoin a piece. In just a one-year period before his arrest, Esser's bank account received $1.3 million in deposits from steroid customers. Ex. B at 75. And at the time of his second arrest, Esser had stashed approximately $14,840 in cash in a hidden compartment above his computer, and the government subsequently learned through his jail calls that authorities missed an additional $5,000 hidden in a cat scratching pad in his apartment.

With Esser's business success inevitably came expensive tastes. He purchased thousands of dollars' worth of Louis Vuitton, Versace, and Gucci items, (Ex. B at 79), drove multiple cars (including a Corvette and BMW X6), stayed in luxury hotels, purchased twelve real estate properties in Pennsylvania, and was known to numerous co-conspirators to be a big spender at strip clubs. His plea agreement provides for the forfeiture of over $130,000 seized from bank accounts, four cars, $17,000 in cash, a gold chain Esser purchased for $30,000, three PA real estate properties, a $214,600 money judgment in lieu of nine other PA real estate properties, and some – but not nearly all – cryptocurrency. ECF Nos. 27 & 29. Despite Esser's obligation to disclose and forfeit his assets, he continues to seek to shield his wealth from the United States.

<u>Esser Continues to Obstruct Justice</u>

The money judgment in the Information is defined as "[a] sum of money equal to the total amount of any property, real or personal, which constitutes or is derived from proceeds traceable to violations of federal law obtained as a result of the offense charged in Counts 1 through 3." ECF No. 27 at 7. As part of his obligations under the plea agreement, Esser agreed to "promptly submit" a DOJ Financial Statement and provide "complete, accurate and truthful" disclosures. ECF No. 29 at 2. He further agreed to identify "all Assets over which Defendant exercises or

5

exercised control, directly or indirectly, within the past five years, or in which Defendant has or had during that time any financial interest." Id. To be compliant with the plea agreement, Esser must "forfeit to the United States all of Defendant's interests in any asset of a value of more than $1,000 that, within the last five years, Defendant owned, *or in which Defendant maintained an interest, the ownership of which Defendant fails to disclose to the United States in accordance with this agreement*." Id. (emphasis added).

In his initial financial disclosure, Esser failed to list any financial accounts containing cryptocurrency. In preparation for a December 2021 meeting to discuss Esser's financial disclosures (and lack thereof), the government poured through information to ascertain any cryptocurrency accounts in which he might have maintained an interest. At the outset of the meeting, Esser filled out a one-page addendum to the financial disclosures form specifically requesting that he disclose "all financial accounts to which [he has] access," including cryptocurrency, but only listed the following crypto interests: (1) one Mycelium Bitcoin wallet with 1.5 Bitcoin; and (2) "unknown" Bitcoin wallet with 0.5 Bitcoin. In reality, however, Esser had an interest in multiple additional cryptocurrency accounts and wallets that he did not list. Not only did Esser withhold information about those accounts in the plea agreement, his original financial disclosure form, and the addendum – he only acknowledged one or two of them at the financial interview after officials confronted him multiple times:

- Coinme Account 1264226399758192640 (ATM cash-to-Bitcoin wallet), used to convert $21,940 in cash to Bitcoin over 13 transactions, and transfer approximately 1.85 Bitcoin to various addresses between May and November 2020.

- One account with Coinomi, used to transfer 6.183215 BTC, over the course of 73 deposits, to numerous other external crypto wallets and exchanges between March 3, 2020 and October 24, 2020 (while on pre-trial release).

- A second account with Coinomi, used to transfer 0.217077 BTC, over the course of 8 transactions, between October 28, 2020 and November 3, 2020 (while on pre-trial release).

- Unknown number of accounts with Mycelium, one of which the defendant claims to contain approximately 1.5 BTC.[5]

- Unknown number of accounts with Coincola.[6]

It is the United States' contention that the defendant used the above cryptocurrency wallets and exchanges, *in addition to multiple others that the government continues to uncover*, to obfuscate the ownership of ill-gotten funds and obstruct the government's ability to forfeit such assets from Esser.

In his sentencing memo, Esser's co-conspirator Lambert signaled that Esser has additional money. Lambert, who also used and spoke to Esser about cryptocurrency during the conspiracy, expressed concern that despite Esser making far more money than Lambert, Esser's asset forfeiture agreement is "only $640,000, while Mr. Lambert's is over $1.5 million." See 2:20-cr-112-RCY-LRL, ECF No. 142 at 3–5. This suggests that Esser's co-conspirator believes Esser has more money that he is withholding – a sentiment also reflected in the conspirators' July 2020 texts: after Lambert sent a picture of a Maserati sports car he was purchasing with cryptocurrency in Texas, Esser replied with a photograph of a 2000 Toyota Camry and texted the jest, "*Mine*." When

---

[5] In the December 2021 financial interview, Esser eventually admitted to owning this Mycelium account. He claimed that the government may access his account on a cell phone seized during his first arrest and gave a supposed passcode to his phone. The passcode did not work, however, and agents were unable to crack the code. When agents physically drove to the Wyatt to have Esser open the phone on January 13, 2022, the Mycelium app was not there.

[6] Esser continues to deny an interest in this account, instead claiming that it belongs to his "supplier." The frequency of transactions (every 2-3 days, to every other week) coupled with the amount transferred (between several hundred, to several thousand dollars at a time), casts doubt on Esser's claims that he was paying a "supplier" for bulk steroid products via this account. His own bank wire transfers from 2018-2019 show less-frequent and higher-value payments to his suspected Hong Kong suppliers. Rather, the crypto activity is consistent with the conclusion that this is an off-shore account where Esser funnels money out of United States jurisdiction. Unfortunately, the United States has been unable to ascertain further information or obtain cooperation from the Hong Kong-based exchange about Esser's true interest in this financial account.

Lambert responded, "It's exactly what you need to drive right now  After your case you can get something dope again," Esser replied, "*Ya!*"  Ex. A at 26–29.

<u>A 121-Month Sentence Avoids Unwarranted Sentencing Disparities</u>

In October 2021, the U.S. District Court in the Eastern District of Virginia sentenced Michael Lambert to 108 months' imprisonment.  The government sought 120 months for Lambert's sentence, having given him the benefit of a 5K (for providing information about Esser and other co-conspirators) and subsequently seeking an upward variance.  <u>See</u> Criminal No. 2:20-cr-112-001.  In Lambert's sentencing memorandum, he advanced significant concerns relevant to Section 3553's sentencing disparity provision:

> In 2018, while working for Esser, Mr. Lambert was arrested in North Carolina for the same conduct as this case – making steroids primarily for Esser. [Lambert] was out on bond when he pled guilty and was sentenced to 19 months in prison. However, rather than surrender on the scheduled date, and after discussions with Esser, Mr. Lambert was persuaded to abscond in order to continue working for Esser under a false identity. He relocated to a residence in York, PA, which Esser owned and made available to him, so that he could continue making steroids for Esser. Mr. Lambert moved to a few different locations before the execution of the search warrant on his residence in VA, and the filing of these charges.
>
> Mr. Esser was not charged in this Indictment. Rather, he was arrested and charged in his home state of Rhode Island . . . . Esser had a number of individuals who "cooked" the powder into liquid form, and Esser provided these cooks with the supplies required for the preparation and packaging of the steroids (as he did with Mr. Lambert). So, Mr. Lambert was not the only cook working for Esser. The others, like Mr. Lambert, were paid cash to perform the tasks . . . . It should be noted that unlike Mr. Lambert, Esser was deceptive with law enforcement authorities after his arrest and even "resisted efforts to open his cell phone using his fingerprint" . . . . Further, "Authorities say Esser continued to sell the drugs even after being questioned by agents with the federal Food and Drug Administration in 2015." Esser entered a plea of guilty on March 23, 2021. He was released on bond, and promptly resumed his steroid distribution scheme. He is now detained and his case is awaiting sentence before Chief Judge John J. McConnell, Jr., on August 2, 2021. Disconcertingly, despite making far more money than his cook Mr. Lambert, Esser's asset forfeiture agreement is only $640,000, while Mr. Lambert's is over $1.5 million. Further, Mr. Esser's Total Offense Level, based on his Plea Agreement filed on PACER, is only two levels higher than Mr. Lambert's (see David Esser Plea Agreement, Exhibit D). There is some inequity in the fact that Esser faces a Total Offense Level close to Mr. Lambert, and a further concern that

>Esser will receive a decidedly more lenient, and unwarrantedly disparate, sentence despite being Mr. Lambert's boss.

See 2:20-cr-112-01-RCY-LRL, ECF No. 142 at 4–5.

As the top of this drug trafficking conspiracy and money laundering scheme, David Esser deserves a sentence more than commensurate with that of his co-conspirator, Michael Lambert – even given the distinction between their criminal histories. The encrypted Wickr messages in Exhibit A demonstrate that Lambert worked to establish labs and co-conspirator operations for Esser and referred Esser to his crypto connect for help. Lambert also described his role "working exclusively for David Esser" and making $5,000-$10,000 *per week* for Esser in the summer of 2020 (after Esser's first arrest). See Exhibit C at 2–3 & Ex. C1 at 4. David Esser earned the role as "boss" of all co-conspirators, and his sentence should reflect that hierarchy.

Another co-conspirator whose sentence should be considered relative to that of Esser is Clyde Peele, who acted as Lambert's right-hand man and primary manufacturer. With a guidelines range of 79-97 months,[7] this 46-year-old co-conspirator received a 60-month sentence in the Eastern District of Virginia for his role pressing powders into steroid pills and packaging them for distribution for just four months. See Criminal No. 2:20-cr-112-03. The rest of Lambert and Esser's co-conspirators received sentences in the Eastern District of Virginia between 3 and 18 months in prison. Laura Lambert, whose GSR was 18-24 months,[8] received an 18-month imprisonment sentence for her role in, *inter alia*, making labels and working with her husband, Michael, in Esser's PA laboratory. See Criminal No. 2:20-cr-112-02. Hamdy Sayed, whose GSR was 6-12 months,[9] received a 3-month sentence of imprisonment for his role in helping to conceal proceeds through cryptocurrency and other electronic apps. See Criminal No. 2:20-cr-112-06. As

---

[7] Peele's Total Offense Level was 27, Criminal History Category II.
[8] Lambert's Total Offense Level was 15, Criminal History Category I.
[9] Sayed's Total Offense Level was 10, Criminal History Category I.

the Court is well aware, Esser's co-conspirators in the District of Rhode Island (Alison Shephard Esser and James McLaughlin) have each received probation sentences for their limited roles of mailing the steroids packages using Esser's Click-N-Ship account.

Finally, the United States Sentencing Commission's Judiciary Sentencing Information System reported an average length of imprisonment of 74 months for the twenty-two offenders whose primary guidelines range fell under Section 2D1.1 for drug type "other," with the same criminal history category and offense level as Esser, during the last five years.[10]  The median length of imprisonment for those offenders was 81 months, and 23% of offenders received within-range sentences. A review of cases nationally shows that most steroid cases lead to lower sentences than the government is requesting here.  However, few defendants charged with distribution of anabolic steroids have the extensively undervalued personal history this defendant presents to the Court.  Moreover, David Esser's total offense level is the highest in any recent steroids case across the nation that the government reviewed.  The staggering number of drugs shipped and incredible proceeds made from his conspiracy, with Esser sitting at the top of it all, justifies a guidelines sentence in this case.

A 121-Month Sentence is Warranted Under 18 U.S.C. § 3147

The government's recommendation of 121 months' imprisonment is appropriate given the "plain and unambiguous" statutory language mandating a consecutive term of imprisonment for a defendant who commits a new crime while on release.  See United States v. Chuong Van Duong, 665 F.3d 364, 366–67 (1st Cir. 2012).  By law, a defendant "convicted of an offense committed while released under this chapter [207] shall be sentenced, in addition to the sentence prescribed for the offense, to . . . a term of imprisonment of not more than ten years if the offense is a felony."

---

[10] United States Sentencing Commission, Judiciary Sentencing Information (JSIN), available at https://jsin.ussc.gov/analytics/saw.dll?Dashboard (last visited January 6, 2022).

18 U.S.C. § 3147(1). The statute mandates that such a term of imprisonment "shall be consecutive to any other sentence of imprisonment." 18 U.S.C. § 3147.

In Defendant Esser's plea agreement, he agreed both that a sentencing enhancement applies to Count II under 18 U.S.C. § 3147(2) and to jointly recommend that the Court impose an additional one year in prison consecutive to any sentence imposed on Count II. See ECF No. 29 at 15.

$6,510,000 Money Judgment

The government is mandated by law to ask for, and the Court must order forfeiture of, "any property constituting, or derived from, any proceeds the [defendant] obtained as the result of" the crimes, along with "any of the [defendant's] property used, or intended to be used . . . to commit, or to facilitate the commission of," the crime. 21 U.S.C. § 853(a)(1)–(2). *See also,* United States v. Monsanto, 491 U.S. 600, 607 (1989) ("Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied."); United States v. McGinty, 610 F.3d 1242, 1246 (10th Cir. 2010) (criminal forfeiture is mandatory under § 982(a)(2); district court erred in refusing to order defendant to pay a money judgment equal to the proceeds of his offense); United States v. Maxwell, 189 F. Supp. 2d 395, 399 n.2 (E.D. Va. 2002) (because criminal forfeiture is mandatory, the primary issue before the trial court is not whether to issue a forfeiture order, but its size and scope). If the defendant no longer has the property, the court "shall order the forfeiture of any other property of the defendant" as a substitute. 21 U.S.C. § 853(p)(1)–(2); United States v. Hall, 434 F.3d 42, 58–60 (1st Cir. 2006). Section 853 holds defendants responsible for the "proceeds" they "obtained" through the conspiracy, no matter their eventual destination. United States v. Bucci, 582 F.3d 108, 121 (1st Cir. 2009).

A forfeiture order may take three forms: money judgment, directly forfeitable property, and substitute assets. United States v. Zorrilla-Echevarria, 671 F.3d 1, 5 (1st Cir. 2011).  In this case, the defendant was notified in the Information about sweeping forfeiture allegations, see ECF No. 27 at 4–10, and the government seeks all three forms: 1) a money judgment in the amount of proceeds obtained by the defendant from the crimes of conviction; 2) the specific assets listed in its forfeiture pleadings (these assets will be credited against the money judgment once they are liquidated); and 3) substitute assets up to the amount of the money judgment.

The government requests that the Court issue one money judgment in the amount of $6,510,000, a sum that will include the $214,600 cash substitute asset for the 9 York Properties, within the requested money judgment amount, the total amount representing a *conservative* figure of the proceeds that the Defendant received from his crimes of conviction.[11] *See* United States v. Poulin, 461 F. App'x. 272, 288 n.8 (4th Cir. 2012) (per curiam) (government is not required to specify any dollar amount in the indictment, so notice that said government would forfeit at least $850,000 did not allow defendant to claim surprise when government sought forfeiture of $1.3 million); United States v. Rosin, 263 F. App'x. 16, 38 (11th Cir. 2008) (in determining amount of money judgment, district court was not limited to amount specified in indictment's forfeiture allegation).

While the government has the burden by a preponderance of the evidence of showing a nexus between the crimes of conviction and the amount sought in a money judgment, that burden may be met with hearsay.  Property is forfeitable under Section 853(a) when a defendant used it to commit the crime or it represents the crime's proceeds.  Courts presume that property is forfeitable if the government shows that the defendant acquired the property during the offense

---

[11] The defendant has already agreed to a money judgment in the amount of $214,600, in lieu of forfeiting nine rental properties his "company" owns in York, Pennsylvania (the 9 York Properties).

and there was no other likely source for the property. *See* 21 U.S.C. § 853(d). United States v. Prather, 456 F. App'x. 622, 625 (8th Cir. 2012) ("The burden is on the Government to prove by a preponderance of the evidence the amount of the proceeds that should be subject to a personal money judgment"); United States v. Pierre, 484 F.3d 75, 86 (1st Cir. 2007) (government may satisfy its burden of proof as to the amount of the money judgment with circumstantial evidence; evidence that defendant sold $3,000 worth of drugs per week for more than three years was sufficient to support a $500,000 money judgment). *See also* United States v. Ponzo, 853 F.3d 558, 590 (1st Cir. 2017) (in drug trafficking conspiracy, First Circuit found that district court properly included gross proceeds from conspiracy in money judgment); United States v. Bogdanov, 863 F.3d 630 (7th Cir. 2017) (district court did not err in considering hearsay statements of co-conspirator in determining amount of forfeiture money judgment).

The following evidence supports the government's request for a $6,510,000 money judgment: The time period of Esser's criminal activity charged in the Information runs from February 3, 2015 through December 14, 2020 (70 months). United States Postal Service records show that Esser's Click-N-Ship account, which allows a customer to create pre-paid Priority Mail shipping labels, generated 9,322 tracking numbers between January 1, 2018 and February 18, 2020 (the date before Esser's first arrest). Of those packages, 9,306 bore fictitious sender/return address information in order to disguise themselves as legitimate packages and avoid law enforcement detection if intercepted.[12] In that 25-month period (which is *less than half* of the 5-year conspiracy charged in Count One), Esser was responsible for distributing 9,306 steroids packages to customers in all 50 states and the District of Columbia.[13] The government

---

[12] The remaining 16 packages contained sender names David Esser or Esser Properties, and addresses legitimately associated with Esser.

[13] Surveillance conducted on various dates in 2019 observed Esser's co-conspirators, Laughlin and Alison, mailing numerous packages billed to Esser's Click-N-Ship account. All of the

calculates the average number of steroid packages Esser mailed per month, therefore, to be 372.[14] Extrapolated to the entire 70-month period, the total number of steroids packages is a staggering 26,040 parcels.

The United States estimates, conservatively, that Esser earned an average of $250 per package mailed. This is a conservative figure based on various forms of evidence from different periods of time. For example, the vast majority of the $1.3M deposits made to Esser's bank account between a 16-month period (June 2018-October 2019) took the form of peer-to-peer payments via Zelle bank transfers. (Exhibit B at 75). These bank transfers are believed to be from Esser's individual customers. Id. at 76–78. A snapshot of a one-month period, in June 2019, showed those individual deposits ranging from $210 to $1,245, with an average of $449 per order and a median of $345. Id. at 76–77.[15] As another point of reference, when law enforcement seized Esser's post office box in February 2020 upon his first arrest, fourteen packages arrived in the course of just one week—totaling $9,765 cash. This suggests an average of $698 per order. Various additional sources of evidence further support the conclusion that an

---

packages contained fictitious sender information that was not associated with the purported return address. (See Exhibit B at 51–62, 67–70). For example, on June 27, 2019, Alison mailed 12 boxes containing steroids (including one addressed to undercover law enforcement agents) from "Rebecca Edge, 183 Lester St, Providence, RI 02907" – a return address of abandoned property that had no "Rebecca Edge" associated with it:

. Exhibit B at 69–70.

[14] This number is in the same ballpark as the estimate that Esser's co-conspirator gave (shipping 15 packages a day, 6 days per week), Exhibit E at 4, which would average 390 parcels per month.

[15] Of the thirteen transfers, only two customers paid under $250. (Exhibit B at 76–77).

average estimate of $250-per-steroids-order is conservative.  Trash pulls at Esser's home in 2019 uncovered drug ledgers with product pricing and a receipt for a $650 order.  Id. at 32–36.  Esser's online advertising on the underground steroid forum BrotherhoodOfPain for his "GoldLine" product in April 2019 required a $200-minimum purchase, Id. at 62–66, and he indicated to undercover agents that he would not accept cash in the mail for "small" orders like their $200 order (incentivizing them to pay via Bitcoin for a discount).  Id. at 66–67.  Finally, having analyzed two of Esser's known cryptocurrency accounts – which he failed to disclose – investigators determined the Bitcoin transactions in March-October 2020 to average $847 per individual order in one account, and transactions in October-November 2020 to average $470 per individual in another.[16]

Multiplying the estimated 26,040 steroids packages at $250 per order over the course of the charged time period, the government *conservatively* attributes $6,510,000 in drug proceeds to David Esser.

## CONCLUSION

The government recommends of a total sentence of 121 months' imprisonment, which would promote respect for the law, satisfy the need for specific deterrence, and comply with the statutory provisions of 18 U.S.C. § 3147 in this case.  The government also seeks a $6,510,000 money judgment against Defendant David Esser.

                                        Respectfully submitted,

                                        UNITED STATES OF AMERICA
                                        By its Attorneys,

---

[16] Using an estimated bitcoin price of $13,000 for October 28, 2020-November 4, 2020 (https://personal-financial.com/2020/10/29/bitcoin-btc-on-october-28-2020/ & https://personal-financial.com/2020/11/04/bitcoin-btc-november-4-2020-the-victory-14000-usd-cryptocurrencies/) and $10,000 for March – October 2020 (https://www.google.com/search?q=2020+bitcoin+price+chart).

ZACHARY A. CUNHA
United States Attorney

/s/ Christine Lowell
CHRISTINE LOWELL
Assistant U.S. Attorney
U.S. Attorney's Office
50 Kennedy Plaza, 8th Fl.
Providence, RI 02903
401-709-5000
401-709-5001(fax)
Christine.lowell@usdoj.gov

## CERTIFICATION OF SERVICE

I hereby certify that on the 14th day of January 2022, I caused the within Government's Sentencing Memorandum to be filed on CM/ECF and viewable to defense counsel.

/s/ Christine Lowell.
CHRISTINE LOWELL
Assistant U.S. Attorney
U.S. Attorney's Office
50 Kennedy Plaza, 8th Fl.
Providence, RI 02903
401-709-5000
401-709-5001(fax)
Christine.lowell@usdoj.gov